# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| JOHN JOHNSTON, | ) |
|     Plaintiff, | ) |
| vs. | ) No. 4:15-CV-0852-DGK |
| COMMERCE BANCSHARES, INC., and PRUDENTIAL INSURANCE COMPANY of AMERICA | ) |
|     Defendants. | ) |

## **ORDER GRANTING DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

This ERISA action arises from Defendant Prudential Insurance Company of America's ("Prudential") decision to terminate Plaintiff John Johnston's ("Plaintiff") long-term disability benefits under a policy purchased by Defendant Commerce Bancshares, Inc. ("Commerce"). Plaintiff alleges Prudential and Commerce improperly terminated benefits to which he was entitled under the policy.

Now before the Court are the parties' cross motions for summary judgment. Holding that Commerce is not a proper party to this lawsuit because it had no involvement in any decision to grant or deny benefits to Plaintiff, and that Prudential's decision to deny Plaintiff benefits under the policy was not an abuse of discretion, Prudential and Commerce's motions are GRANTED (Docs. 55, 57) and Plaintiff's motion is DENIED (Doc. 59).

### Summary Judgment Standard

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of explaining the basis

for its motion, and it must identify those portions of the record which demonstrate the absence of a genuine issue of material fact. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011).

**Background**

The Court finds the material, undisputed facts to be as follows.[1]

Commerce employed Plaintiff in its computer department as an Enterprise Storage Engineer. As part of his compensation package, Commerce provided him with a long-term disability insurance policy ("the Plan") which it purchased from Prudential.

**The Plan's provisions.**

The Plan states that Prudential is the claims administrator, and Prudential "as Claims Administrator has the sole discretion to interpret the terms of the Group Contract, to make factual findings, and to determine eligibility for benefits. The decision of the Claims Administrator shall not be overturned unless arbitrary and capricious." Administrative Record ("R.") at 100 (Doc. 54).

The Plan defines disability as when: "[1] you [the claimant] are unable to perform the material and substantial duties of your regular occupation due to sickness or injury; [2] you are under the regular care of a doctor; and [3] you have a 20% or more loss in your monthly earnings due to that sickness or injury." R. at 69. Prudential determines whether a claimant meets the definition of disability. R. at 69. It provides Prudential may stop sending payments if the claimant fails "to submit proof of continuing disability satisfactory to Prudential." R. at 78. The Plan also provides,

---

[1] The Court has limited the facts presented here to those that are not in dispute and relevant to the motion. The Court has excluded legal conclusions, argument presented as fact, and proposed facts that are not properly supported by admissible evidence. *See* Fed. R. Civ. P. 56(c); L.R. 56.1(a). The Court has included reasonable inferences from material facts not in dispute and proposed facts the opposing party has not controverted properly.

> [Prudential] may request that you send proof of continuing disability, satisfactory to Prudential, indicating that you are under the regular care of a doctor. . . . Prudential will deny your claim or stop sending you payments if the appropriate information is not submitted.

R. at 90.

**Plaintiff's illness and the initial claim approval.**

On June 14, 2013, Plaintiff stopped working because of hydrocephalus[2] which, doctors later learned, was caused by a colloid cyst in the third ventricle of his brain. The hydrocephalus, in turn, caused Plaintiff to develop neuropsychological problems.

It is unknown exactly when Plaintiff began experiencing changes in his health attributable to the cyst. Plaintiff's wife reports his behavior began changing in 2007, when he started becoming increasingly angry. Sometime after 2010, the family began seeking mental health treatment because of his behavior change, which the family attributed to depression and Plaintiff not sleeping well due to sleep apnea. In June of 2012, Plaintiff began losing control over his urine, and shortly after that, his stool. He also began experiencing problems with his gait. He was eventually referred to a neurologist who could not find anything wrong and referred him back to a psychiatrist.

During a subsequent visit with a psychiatrist, Plaintiff's wife interjected that he was having serious problems and requested an MRI because she feared he may have had a stroke. The psychiatrist then ordered an MRI which revealed a colloid cyst and enlarged ventricles in his brain.

---

[2] Hydrocephalus is a condition causing an excess of cerebrospinal fluid to build up around the brain, putting pressure on the brain.

In July of 2013, Plaintiff underwent brain surgery to remove the cyst and relieve the pressure on his brain. Following the surgery, a neurologist, psychologist, and physical medicine and rehabilitation doctor all treated Plaintiff.

Plaintiff filed his claim for long-term disability benefits on October 8, 2013. The rehabilitation doctor submitted a statement on October 10, 2013, in which he opined Plaintiff was permanently disabled with moderate to severe cognitive impairments and decreased memory, judgment, attention, and problem solving.

On October 24, 2013, a Prudential team comprised of team lead Kellie Tattersall, clinician Laurel Cox, R.N., vocational rehabilitation specialist David Carey, and disability claims manager Justin Huth, discussed Plaintiff's claim. Ms. Cox noted Plaintiff had undergone two rounds of neuropsychological testing, most recently in October 2013, and that it would be helpful to have the results of that testing in determining the severity and prognosis of Plaintiff's illness. Ms. Cox noted it did not appear necessary to obtain the raw data underlying the neuropsychological testing at that time.

As best the Court can determine, during this meeting Prudential decided to approve Plaintiff's claim for long-term disability benefits, at least through the duration of his physical therapy.[3] On November 7, 2013, Prudential sent Plaintiff a letter stating:

> We have approved your LTD claim. We have reviewed the medical information provided by your treating physician and have determined that you are currently disabled from your regular occupation as defined in the enclosure. This letter outlines some of the programs and benefits that are available. Whenever possible, we want to work with you on your return to work efforts.

---

[3] The notation in the record states as follows: "LTD Analysis: Given EE LOV of 11/4/13 resulted in AP RX of 4 weeks PT and 00W for another 4 weeks it is reasonable to support LTD thru duration of PT. If no RTW after PI to obtain PT DC and Updated OV from Ortho." Unfortunately, neither party has supplied the Court with a list of terms explaining what these acronyms mean.

4

> . . .
>
> To be eligible to receive benefits, you must be continuously disabled from performing the material and substantial duties of your regular occupation through the entire elimination period. Since you have met this requirement, your LTD claim has been approved and benefits begin effective December 12, 2013.
>
> . . .
>
> At this time we have requested the results of your two Neuropsychological examinations from Patrick Caffrey, Ph.D. and Eric Eckhmd-Johnson, Ph.D. Please contact these providers to obtain the medical records and advise of our request. This information is needed for the ongoing review of your claim and benefits beyond December 31, 2013.

R. at 761-62.

**Prudential's subsequent denial of the claim.**

At some point, it is unclear when,[4] Prudential received the results of the July 2013 and October 2013 neuropsychological testing. Mr. Huth and Ms. Cox discussed the October results. Mr. Huth noted the results were not considered valid due to Plaintiff's inconsistent performance. It appeared from the neuropsychological testing that Plaintiff had some cognitive impairment, but it could not be determined how much. Mr. Huth also noted that with cognitive therapy and behavioral health counseling, at "least partial improvement would be expected." R. at 823. Mr. Huth and Ms. Cox agreed that Plaintiff would not have sustained capacity for work at the time, but that Mr. Huth would follow up with Plaintiff in two to three months after he had obtained therapy and counseling.

---

[4] Prudential contends it received the reports on December 9, 2013, and December 26, 2013, respectively. But the record entry listing when these records were received is dated December 11, 2016, which is obviously incorrect.

5

Sometime in March of 2014, Plaintiff underwent another surgery to place a shunt in his brain because the ventricles in his brain had not returned to their normal size after the prior surgery to remove the cyst.

On March 11, 2014, Linda Gasowski discussed the claim with Mr. Huth, Ms. Cox, and Mr. Carey. They decided to refer Plaintiff's file to a physician for review because of the claim's multiple records and providers, inconsistencies in reports, and complexity.

On March 24, 2014, Rajesh Wadhwa, M.D., a claim manager for Prudential who is a board-certified doctor in internal medicine and occupational medicine, reviewed Plaintiff's medical records. He concluded there was some evidence that Plaintiff had cognitive impairments, but the extent of any such impairment was unclear due to the inconsistent neuropsychological testing results. Dr. Wadhwa noted the neuropsychological testing performed on July 20, 2013, indicated Plaintiff had significant cognitive defects, while testing conducted in October of 2013 displayed validity indices that resulted in an inconclusive assessment of cognitive abilities in some areas and normal abilities in some other measures. He concluded that Plaintiff's cognitive abilities had improved significantly, but it was not clear if he had adequate abilities to accomplish tasks at work.

On April 12, 2014, the Social Security Administration awarded Plaintiff Social Security Disability Income ("SSDI") benefits beginning January 1, 2014. As part of Plaintiff's SSDI evaluation, he underwent a psychological evaluation in February 2014. Plaintiff provided this evaluation to Prudential on April 23, 2014.

On April 15, 2014, Prudential, through Mr. Huth, extended Plaintiff's benefits to April 30, 2014. Mr. Huth also scheduled a senior claim review with neuropsychological input.

On May 1, 2014, Prudential held the senior claim review with five participants, including Mr. Huth and psychologist Melvyn Attfield, Ph.D. The participants determined that a comprehensive, independent in-person neuropsychological evaluation of Plaintiff should be conducted.

On June 17, 2014, Dr. Robert L. Denney, Psy.D., a board-certified clinical neuropsychologist, examined Plaintiff, administered a battery of neuropsychological testing, and on June 27, 2014, submitted a 38-page report. Dr. Denney concluded that he did "not have valid and reliable evidence that Mr. Johnston has ongoing cognitive deficits; as a result, I am not able to provide a reasonable prognosis for improvement should there be an impairment that results in limitation." R. at 658. The embedded and freestanding validity measures contained in the test indicated Plaintiff was not giving his best effort in the testing.[5] In fact, Plaintiff's efforts were consistent with an attempt to feign cognitive problems.

---

[5] Dr. Denney's report observes:

> A number of tests were used to assess Mr. Johnston's motivation and effort to perform well on cognitive testing. Tests which measure the validity of the examinee's performance come in two forms: freestanding and embedded indices of performance validity. Freestanding tests usually appear to measure a domain such as memory, whereas, in reality, the test would only show impairment for those individuals with extremely severe memory impairment. In this way, we can assess whether an examinee is giving adequate effort, less than adequate effort, or, in some cases, even effortfully trying to appear impaired. Embedded indices on the other hand, are inside traditional neuropsychological testing. They are scientifically validated after the original tests were released. These indices can provide an indication of whether or not the examinee is applying appropriate effort on testing as well. Last, there are symptom validity measures too, which can identify if an examinee is exaggerating on self-report measures.
>
> Three such freestanding performance validity tests were administered to Mr. Johnston, two in the morning and one in the early afternoon. He failed all three tests and two of them indicated he was actively attempting to perform poorly. These tests are referred to as "forced-choice tests." In other words, the test taker is shown something (words, numbers, etc.) with the expectation he will try to remember the information. He is then presented with two choices and asked which one he remembers. Even someone who could not see the stimuli (i.e. someone who is blindfolded) would, on average, answer approximately 50% of the items correctly just by guessing. Given this format, a person with no ability whatsoever will likely perform within the random range. When a performance

7

The situation was more complex than a simple case of a claimant trying to "fake it" to gain benefits. As Dr. Denney explained, Plaintiff's third ventricle cyst and hydrocephalus may have caused his behavior to change. Dr. Denney wrote:

> Results from this current evaluation clearly indicate Mr. Johnston was attempting to appear more cognitively impaired than was genuinely the case. The presence of below random performance on performance validity measures along with exaggerated symptom report findings, in the context of a disability related evaluation warrant the conclusion of malingering.
>
> The presence of malingering, however, does not necessarily mean significant cognitive deficits do not exist. Malingering and significant cognitive deficits can co-occur. The problem in this case is that the medical record demonstrates a condition exists for which significant cognitive deficits are possible, but Mr. Johnston was also malingering. It is possible given communicating hydrocephalus that his real condition has deteriorated even since the placement of the VP shunt; however, it is more likely [to] have remained static or improved. It is impossible to determine what is truly occurring without current reliable and valid test data.
>
> In my clinical opinion, he likely does have some level of cognitive deficits that could affect daily functioning, but without valid test data results, I cannot identify his strengths and weaknesses. Thus, I cannot properly diagnose the presence of a Mild or Major Cognitive Disorder and am left with noting the need to rule out such diagnoses.
>
> . . .

---

deviates from random enough, it becomes statistically significant. People with good ability should perform well above the random range because they know the correct answers and choose their responses accordingly. When scores fall below random, it also indicates the person knew the correct answers, but intentionally chose wrong answers instead of correct answers. This testing paradigm can be compared to flipping a coin. If a coin is flipped a number of times, it will fall on heads approximately 50% of the time. If it does not, to a statistically significant degree, it can be assumed the coin is weighted. Consequently, the probability of such a score occurring by chance alone is remote to a specific level of statistical certainty.

R. at 646.

The record noted Depression and Anxiety on multiple occasions. It appears the depression and anxiety did not begin until the period before the cyst and hydrocephalus was identified. *Consequently, the diagnoses of Depressive Disorder and Anxiety Disorder in the record should more correctly indicate their presence due to third ventricle cyst and communicating hydrocephalus.* Although they could have been diagnosed as such if freestanding, the concomitant presence of Major Neurocognitive Disorder would have more properly changed that diagnosis as well. Major Neurocognitive Disorder can include a behavioral changes specifier, which could include mood and/or anxiety alterations. In the diagnostic formulation below, I include them under the behavioral change specifier. Mild Neurocognitive Disorder does not have the behavioral specifier, which necessitates my inclusion of the need to rule out Depressive Disorder and Anxiety Disorder Due to Third Ventricle Cyst and Communicating Hydrocephalus as well if it is ultimately determined that he does not have Major Neurocognitive Disorder. As a result of his exaggeration on the self-report inventory, I cannot determine if this prior level of depression and/or anxiety continues; they must, consequently, also remain rule out diagnoses.

The medical record included multiple notations of a Personality Disorder. It appears from reviewing the entire record that this diagnosis is not correct. An unspecified Personality Disorder suggests a maladaptive personality problem that pre-existed the development of the third ventricle cyst and communicating hydrocephalus. *It appears, however, that the record actually indicates that personality change occurred as the cyst and hydrocephalus were developing (the few years preceding the initial surgery). Consequently, Personality Change due to third ventricle cyst and communicating hydrocephalus may have been the proper diagnosis.* This diagnosis does not suggest premorbid personality pathology. As noted above, the concomitant presence of Major Neurocognitive Disorder has a behavioral change specifier. This specification can also include personality change as a result of the neurological impairment. I include any potential ongoing personality change under this specifier below. Mild Neurocognitive Disorder does not have the behavioral specifier, which necessitates my inclusion of the need to rule out Personality

9

> Change Due to Third Ventricle Cyst and Communicating Hydrocephalus as well if it is ultimately determined that he does not have Major Neurocognitive Disorder. It is possible the personality change has resolved after the cyst removal and shunt placement; without valid test data and behavioral presentation from Mr. Johnston, it is impossible to determine.

R. 652-54 (emphasis added). Dr. Denney diagnosed Plaintiff with malingering Neurocognitive Dysfunction, but noted Plaintiff had five other "rule out," or possible, diagnoses: Major Cognitive Disorder, with behavioral changes (depression, anxiety, and personality changes); Minor Cognitive Disorder; Depressive Disorder Due to Third Ventricle Cyst and Communicating Hydrocephalus; Anxiety Disorder Due to Third Ventricle Cyst and Communicating Hydrocephalus; and Personality Change Due to Third Ventricle Cyst and Communicating Hydrocephalus. R. at 654. Ultimately, Dr. Denney could not opine for certain one way or the other whether Plaintiff was functionally impaired.

Prudential received the raw data from Plaintiff's July and October 2013 neuropsychological testing in July of 2014 and forwarded it to Dr. Denney. Dr. Denney reviewed it and created an addendum to his earlier report. Dr. Denney concluded that nothing in the raw test data changed the clinical opinions or diagnostic opinions in his earlier report. In fact, some of the earlier testing strengthened his convictions about his conclusions. Dr. Denney did not seek to review the raw data from the report prepared for the Social Security Administration by Dr. Nina Epperson, M.S., because her testing did not contain any free-standing performance validity measures.

On September 22, 2014, Prudential notified Plaintiff by telephone that it was retroactively extending his benefits through August 31, 2014.

On October 2, 2014, Prudential sent Plaintiff a letter notifying him that "we have determined that no benefits are payable beyond August 31, 2014. As a result, we have closed your claim effective September 1, 2014." R. at 781. It stated,

> Based on the review of the file, we found that your reported memory impairment is not supported based on the medical information provided by you in your claim and lack of validity [of] your performance given during the Neuropsychological Examination. At your request, we have enclosed both the Neuropsychological Exam and Addendum completed by Dr. Denney.
>
> We have determined that the information in your file does not support impairment that would prevent you from performing the material and substantial duties of your regular occupation.
>
> After a thorough evaluation of the information in your file, we have determined that you no longer meet the definition of disability as defined in the attached Long Term Disability Policy Provisions. Therefore, we have terminated your claim.

R. at 781.

**Plaintiff's appeal.**

Plaintiff appealed the denial on March 3, 2015. His appeal raised five arguments: (1) Dr. Denney's opinion was not conclusive because he did not claim that Plaintiff was not impaired, only that he exaggerated his symptoms; (2) Plaintiff's own healthcare providers disagreed with Dr. Denney; (3) although the October 2013 neuropsychological testing provided inconsistent results, the neuropsychologist administering the testing thought Plaintiff had some cognitive deficits whether from neurological or emotional dysfunction; (4) Prudential did not provide any opinion from the computer industry that Plaintiff could perform his regular occupations; and (5) Prudential's denial was based on the subjective conclusion of non-treating health care providers that Plaintiff was faking.

11

The only additional medical documentation Plaintiff provided with his appeal was a letter from Plaintiff's therapist, Marcia Meyer, Ph.D., dated November 7, 2014. Dr. Meyer argued that Plaintiff had been exhausted by the neuropsychological testing administered by Dr. Denney, and that he was not able to maintain the focus and concentration necessary to perform a full-time job. Dr. Meyer indicated she had experience distinguishing authentic problems from fabricated ones, and that Plaintiff truly had residual problems from brain surgery. Dr. Meyer did not provide or refer to any additional testing of Plaintiff in support of her conclusions.

Prudential then arranged for another board-certified neuropsychologist, Michelle Zeller, Psy.D., to review Plaintiff's file, including Dr. Denney's raw data and her own newly administrated neuropsychological testing. Dr. Zeller conducted her new testing on June 8, 2015, and submitted her twenty-eight page report on June 24, 2015.

She determined Plaintiff failed all nine symptom validity measures on cognitive and psychiatric tests that she administered, and she concluded there was no reliable and valid evidence that Plaintiff had cognitive deficits. She concluded that Plaintiff was attempting to appear more impaired than he actually may have been. She noted that in addition to failing all the validity measures, other factors suggested a diagnosis of "Definitive Malingering Neurocognitive Dysfunction." These were: (1) the incentive of his benefits being terminated; (2) discrepancies between his test results and behavior she observed during the testing;[6] and (3) the fact that his description of memory loss was inconsistent with an organic brain injury in that he professed to forget good memories, but remembered bad ones, which was more consistent with an effort to exaggerate symptoms. In closing, she observed:

---

[6] For example, she observed that he took much time to answer simple questions related to his personal history, but was able to perform more difficult, complex tasks more quickly and without difficulty. Also, he reported memory complaints, but reminded Dr. Zeller that she had asked for a photocopy of his driver's license hours earlier.

> [T]here is no reliable and valid evidence that Mr. Johnston is functionally impaired due to significant exaggeration of cognitive and psychiatric dysfunction. A diagnosis of Malingering does not rule out the possibility that he may, in fact, have genuine symptoms that are causing functional impairment. However, based on observation, there does not appear to be any functional impairment.

R. at 426.

Following receipt of this report, Prudential sent Plaintiff a letter dated July 17, 2015, upholding its decision to discontinue benefits.

Commerce took no part in any review of Plaintiff's claim for benefits, any determination of his eligibility for benefits, any decision to award him benefits, and any decision to terminate benefits.

**Standard of Review**

Where, as here, an ERISA plan grants the administrator discretionary authority to determine eligibility for benefits or to construe the terms of the plan, a federal court reviews the insurer's denial of benefits under a deferential abuse of discretion standard. *Green v. Union Sec. Ins. Co.*, 646 F.3d 1042, 1050 (8th Cir. 2011).

> In reviewing for an abuse of discretion, the administrator's decision should be reversed only if it is arbitrary and capricious. The administrator's decision should be affirmed if it is reasonable, meaning it is supported by substantial evidence. Substantial evidence is more than a scintilla but less than a preponderance. "The requirement that the plan administrator's decision be reasonable should be read to mean that a decision is reasonable if a reasonable person *could* have reached a similar decision, given the evidence before him, not that a reasonable person *would* have reached that decision." *Midgett v. Wash. Group Int'l Long Term Disability Plan*, 561 F.3d 887, 897 (8th Cir.2009).

*Green*, 646 F.3d at 1050. The plaintiff in an ERISA case bears the burden of showing he is entitled to benefits under the plan's terms; the claim administrator only bears the burden of proof

13

where it is claiming an exclusion applies.[7] *Mario v. P & C Food Markets, Inc.*, 313 F.3d 758, 765 (2d Cir. 2002).

Also where, as here, the claim administrator holds the dual role of evaluating claims and paying claims, it is operating under a conflict of interest that the court considers as a factor in determining whether the claim administrator abused its discretion. *Donaldson v. Nat'l Union Fire Ins. Co. of Pitts, Pa.*, -- F.3d --, 2017 WL 3122070, at *1 (8th Cir. July 27, 2017). The conflict of interest is weighed as one of several factors and "serves 'as a tiebreaker when the other factors are closely balanced' and is 'more important . . . where circumstances suggest a higher likelihood that it affected the benefits decision' and 'less important . . . where the administrator has taken active steps to reduce potential bias and to promote accuracy.'" *Hackett v. Standard Ins. Co.*, 559 F.3d 825, 830 (8th Cir. 2009) (quoting *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008)). In the present case, nothing in the record suggests there is a higher likelihood that Prudential's conflict of interest affected its decision, so the Court does not give this factor great weight in the analysis. *See Donaldson*, 2017 WL 3122070 at *1.

## Discussion

Prudential argues its decision to discontinue benefits was reasonable, or at least was not an abuse of discretion, because Plaintiff failed to provide proof of an ongoing cognitive impairment.

---

[7] Plaintiff's assertion that *Hopkins v. AT&T Umbrella Benefit Plan No. 1* stands for the proposition that once the plan administrator begins paying benefits, the burden of proof shifts to the plan administrator to support any termination of benefits, is incorrect. If the plan administrator initially grants benefits and then subsequently revokes its approval or denies benefits, at most the earlier decision matters only to the degree it shows the later decision to deny benefits was unreasonable. It does not shift the burden of proof. "Paying benefits does not operate 'forever as an estoppel so that an insurer can never change its mind . . . the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." No 5:12-CV-0102-NKL, 2013 WL 12144078, at *9 (W.D. Mo. June 4, 2013) (quoting *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 589 (8th Cir. 2002)).

Plaintiff argues Prudential erred in discontinuing his long term disability benefits because: (1) it unreasonably interpreted the Plan's terms to require proof of continued disability; (2) it failed to show Plaintiff had made significant improvement so that he would be able to return his previous work or perform any other gainful occupation for which he is reasonably fitted; (3) it disregarded key evidence showing he was disabled in favor of reports from its own paid doctors; and (4) it failed to consult a vocational rehabilitation specialist before terminating benefits.

### A. Commerce is not a proper party to this lawsuit.

Commerce alleges, and Plaintiff does not dispute, that it was not the claims administrator and had no involvement in any benefits determination for Plaintiff at any time, nor was it ever responsible for paying benefits to him under the Plan. Accordingly, Commerce is not a proper party to this lawsuit, and its motion for summary judgment is granted. *See Brown v. J.B. Hunt Transp. Servs., Inc.*, 586 F.3d 1079, 1088 (8th Cir. 2009).

### B. Prudential reasonably interpreted the Plan's terms to require proof of continuing disability due to sickness or injury.

The first question is whether Prudential's interpreting the Plan to require Plaintiff to provide proof of continuing disability was reasonable. To determine whether a claim administrator's interpretation of plan language was reasonable when a court is reviewing the language under the abuse of discretion standard, the court must consider the five *Finley*[8] factors: (1) whether the interpretation is consistent with the plan's goals; (2) whether the interpretation renders any plan language meaningless or internally inconsistent; (3) whether the interpretation conflicts with the substantive or procedural requirements of the ERISA statute; (4) whether the

---

[8] The name is taken from the Eighth Circuit case which recognized these factors, *Finley v. Special Agents Mutual Benefit Association, Inc.*, 957 F.2d 617, 621 (8th Cir. 1992).

administrator interpreted the words at issue consistently; and (5) whether the interpretation is contrary to the clear language of the plan. *Id.* at *2. Even then, while these factors inform the analysis, the dispositive principle remains that where the claim administrator has offered a reasonable interpretation of a disputed provision, a court may not replace the administrator's interpretation with its own, and thus cannot disturb the challenged determination as an abuse of discretion. *Id.*

The Plan states Prudential determines whether a claimant meets the definition of disability. It states Prudential may stop sending payments if the claimant fails "to submit proof of continuing disability satisfactory to Prudential," and that Prudential "may request that [the claimant] send proof of continuing disability, satisfactory to Prudential, indicating that you [the claimant] are under the regular care of a doctor." Prudential may require the claimant "to give Prudential authorization to obtain additional medical information . . . as part of your proof of claim, or proof of continuing disability." It also cautions that if the appropriate information is not submitted, "Prudential will deny your claim or stop sending you payments."

Prudential contends it reasonably interpreted this language to mean it could approve Plaintiff's benefits for a limited period of time and require him to provide proof of continuing disability throughout the period for which he is seeking benefits.

A header in Plaintiff's brief indicates he is challenging Prudential's interpretation of this language, but the body of his brief does not; indeed, Plaintiff's brief does not even mention the *Finley* factors. Instead, Plaintiff challenges Prudential's *application* of this language to his claim. The Court discusses this application below in part C.

As for Prudential's interpretation of the Plan's language, the Court holds it is reasonable, at least when reviewed under an abuse of discretion standard, because it satisfies the five *Finley*

factors. First, Prudential's interpretation is consistent with the Plan's goals in that it provides benefits only when a claimant provides continuing proof of a sickness or injury preventing him from performing the duties of his regular occupation. Second, the interpretation does not render any language in the Plan meaningless or inconsistent. Third, the interpretation does not conflict with any ERISA requirement. Fourth, Prudential has interpreted this language consistently. Fifth, the interpretation is not contrary to any clear language in the Plan.

Consequently, the Court holds Prudential reasonably interpreted the Plan to require Plaintiff provide proof of continuing disability.

### C. Prudential's decision to discontinue paying benefits was not an abuse of discretion.

The Court also finds Prudential's application of this language to Plaintiff's claim was not an abuse of discretion. Prudential argues its determination that Plaintiff was not disabled was reasonable because he failed to provide satisfactory proof that he continued to suffer from cognitive impairments that prevented him from working after December 31, 2013.

Plaintiff responds that Prudential never informed him that the proof he supplied was unsatisfactory, nor did it request he provide supplemental information prior to terminating his benefits. Plaintiff contends he supplied proof of his cognitive impairment many times.

Plaintiff's arguments are unavailing. As a threshold matter, it was Plaintiff's burden to show he is entitled to benefits under the Plan's terms; it was not, as Plaintiff intimates, Prudential's burden to show Plaintiff was not entitled to benefits. *See Mario*, 313 F.3d at 765.

Further, Prudential did not abuse its discretion because substantial evidence supports its determination that Plaintiff failed to prove that he continued to suffer cognitive impairments when it discontinued benefits. There is overwhelming evidence on the record that the neuropsychological testing indicating Plaintiff had disabling cognitive impairments was invalid

because, as Dr. Denney put it, Plaintiff "was attempting to appear more cognitively impaired than was genuinely the case." This information, which Prudential learned after initially approving Plaintiff's claim, significantly outweighs the fact that it had previously agreed to pay benefits. Thus, Prudential's decision to discontinue paying benefits was not arbitrary and capricious.

Granted, there is evidence here supporting an award of benefits. In fact, if the Court were the claims administrator, it might have reached a different conclusion. Obviously, Plaintiff did not fake having a colloid cyst in the third ventricle of his brain, undergoing brain surgery, or experiencing some neuropsychological problems. Also, the Social Security Administration—a sophisticated entity experienced at weeding out phony claims—found Plaintiff had severe cognitive impairments which prevented him from working. And the expert the Court finds most persuasive, Dr. Denney, found Plaintiff "likely does have some level of cognitive deficits that could affect daily functioning." Indeed, Dr. Denney acknowledged that although Plaintiff was malingering, he could still have significant cognitive deficits, noting "[m]alingering and significant cognitive deficits can co-occur." He speculated that Plaintiff's behavioral changes might have been caused by the cyst and hydrocephalus, a possibility he accounted by listing "Major Cognitive Disorder, with behavioral changes (depression, anxiety, and personality changes) and "Personality Change Due to Third Ventricle Cyst and Communicating Hydrocephalusas" as "rule out" diagnoses.

That said, Prudential's decision is still supported by substantial evidence. Although the Social Security Administration found Plaintiff disabled, it reached its decision under a different standard than that used by the Plan, and it did not have all the evidence before it, including Dr. Denney's report, that Prudential had when it decided to discontinue benefits. Further, Dr. Denney's conclusion that without valid test results there was no neuropsychological *evidence* to

properly diagnose with either a mild or major cognitive disorder is practically unassailable. Hence, Prudential's decision to discontinue benefits on the ground that Plaintiff failed to prove he suffered from cognitive impairments is supported by substantial evidence, even if this finding is arguably opportunistic or self-serving since Prudential is responsible for both evaluating Plaintiff's claim and paying Plaintiff's claim. *See Donaldson*, 2017 WL 3122070 at *1.

### D. Prudential was not required to consult a vocational rehabilitation specialist.

Finally, Plaintiff argues Prudential had a responsibility to have a vocational expert review his claim to determine if, in light of his present impairment, he was fit for work.

This argument is unpersuasive, because it assumes what Plaintiff failed to prove, namely, that he possessed sufficient limitations, that an opinion from a vocational expert was required to determine whether he could perform any occupation. As Dr. Denney noted, Plaintiff "likely does have some level of cognitive deficits that could affect daily functioning, but without valid test data results, I cannot identify his strengths and weaknesses." Because there are no valid test results here, there is no basis on which to find Plaintiff has any limitations, thus asking a vocational expert to give an opinion on what work Plaintiff can perform, if any, is pointless. Thus, Prudential did not err in failing to consult a vocational rehabilitation specialist.

### Discussion

For the reasons stated above, the Court finds Prudential's decision to discontinue providing benefits to Plaintiff is supported by substantial evidence in the record. Prudential and Commerce's motions for summary judgment (Docs. 55, 57) are GRANTED and Plaintiff's motion (Doc. 59) is DENIED.

**IT IS SO ORDERED.**

Date:  August 28, 2017  /s/ Greg Kays
GREG KAYS, CHIEF JUDGE
UNITED STATES DISTRICT COURT